STATE, RESPONDENT, *v.* HANKS, APPELLANT.

(No. 8504.)

(Submitted September 18, 1944. Decided November 21, 1944.)

[153 Pac. (2d) 220.]

*Mr. Ernest A. Peterson,* for Appellant, submitted an original and a reply brief, and argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. Fred Lay,* First Assistant Attorney General, and *Mr. H. A. Bolinger, Jr.,* for the State, submitted an original and a supplemental brief; *Mr. Lay* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Defendant appeals from a judgment of conviction of the crime of obtaining property by false pretenses, which was rendered against him pursuant to the verdict of a jury. The grounds of appeal are that the information fails to state a public offense, and that the evidence is insufficient to sustain the verdict.

Defendant Hanks arranged by correspondence with R. A. ▮ Shumate, the owner of a stallion, to have the animal sold and delivered to him at Belgrade, the agreed price for the animal and for its delivery there being $260. Before the date set for delivery Shumate received through the mail a card purporting to be signed by one L. D. Neavitt indicating that the latter was the purchaser and Hanks his agent. Subsequently, on June 26, 1943, Shumate delivered the animal to Hanks at Belgrade, to-

gether with a bill of sale naming Neavitt as the purchaser. At the same time Hanks gave Shumate a check on a Dillon bank for $260 purporting to bear Neavitt's signature, and also a letter purporting to have been written by Neavitt and stating that, being unable to come to Belgrade, Neavitt had sent his check to Hanks. Hanks then hired another man to haul the animal to a ranch across the road from Hanks' home near West Yellowstone and the Idaho line, and gave him a like check for $20 purporting to have been signed by Neavitt.

Both checks were rejected by the Dillon bank because there was no account there in Neavitt's name. Shumate then wrote to Neavitt at Dillon, but the letter came back with the notation that Neavitt was unknown. Diligent inquiry resulted in finding no one who had ever heard of Neavitt. Hank's story was that Neavitt lived in Dillon, had a ranch near Idaho Falls, and had met him at Ashton, Idaho, pursuant to prior correspondence; that Hanks described the animal to Neavitt although he had never seen it, and that Neavitt commissioned him to buy it and gave him $10 in cash for his services, together with two blank checks on the Dillon bank with verbal authority to write and use them for the payment of the purchase and delivery charges, signing Neavitt's name to them.

Upon Shumate's complaint the sheriff of Gallatin County went to West Yellowstone on July 29, 1943, and made inquiry of Hanks, who told him that the stallion had been taken away for Neavitt by two men with a green Chevrolet coupe and trailer. Hanks claimed to have some letters from Neavitt in his desk; but he was unable to find them, although he had correspondence piled in chronological order going back for many years. Later he explained that he had caused some letters to be burned and that the ones from Neavitt must have gotten in with them by mistake. The only items found with Neavitt's name were an envelope and letter which Hanks had written and directed to Neavitt at Dillon with the bill of sale and the inspection certificate for the animal in question; but the letter was returned by the post office marked "unclaimed." The letter was dated

June 26, 1943, the day of purchase, and stated that the animal "was trucked from Belgrade as per your orders to Idaho." Hanks left the sheriff on the pretense of a short errand and did not return until morning. Meantime the sheriff had found the animal in the road about a half mile from defendant's house. He testified that on Hanks' return next morning Hanks stated that he had decided to tell the truth and that the horse was in a corral across the Idaho line; that the defendant then took the sheriff to the corral and stated that he had the stallion picketed out in the timber across the road when the sheriff arrived the day before; that during the night he had taken it to this corral, and that the horse had escaped to the road through a gate which defendant had not known was open; that defendant then said to his mother in the sheriff's presence that he was guilty, and that his mother had replied that she had not brought him up that way. At the trial defendant denied making these statements, but admitted his mother's reply and said that it was merely in answer to the statement that he was accused of the crime.

On being confronted by Shumate at the jail, Hanks authorized the sheriff to pay some $30 of his money to Shumate to defray the latter's expense in connection with the transaction. Shumate also received back the stallion a few days later. According to Shumate's testimony defendant said to the sheriff "all the money that I have, with the exception of a little to get back to West Yellowstone, I want you to turn over to Mr. Shumate, partly in restitution of what I have done." Hanks did not deny this but stated as his reason for authorizing the payment that "I feel (felt) that if he had been wronged and he had come this far after the horse, I was entitled to pay his expenses, anyway, on the assurance that I had made him beforehand." Hanks claimed to have promised to reimburse Shumate if the Neavitt check was not good, but Shumate denied that Hanks had made any such promise or suggestion concerning the check.

At the trial two letters received by Shumate were admitted in evidence. One was postmarked at Idaho Falls on July 3, 1943, was signed "L. B. Neavitt" and acknowledged receipt of the

stallion. The other was written and signed by Hanks under date of September 20, 1943, after his arrest and said: "I have hopes you have overlooked and forgiven in your mind your harsh thoughts of me. Allow me to apologize and try and retrieve your regards for me, and some day may we meet on equal footing again." Defendant admitted writing this letter but explained it as merely expressing his regret at having subjected Shumate to trouble and expense by involving him in the transaction, but without any admission of personal guilt. A bank cashier who qualified as a handwriting expert testified that in his opinion these two letters, the two checks, the "Neavitt" letter delivered by defendant to Shumate with the $260 check, another letter from Hanks to Shumate, and Hanks' signature to the sheriff's inventory of property impounded on his arrest, were all written by the same hand. Defendant admitted having signed the checks with Neavitt's name and insisted that he had oral authority from Neavitt for doing so. Confronted with the fact that Neavitt's letter, which he delivered to Shumate with the $260 check, said that Neavitt had "sent check by bearer Mr. Hanks," the defendant testified that he was unable to see any discrepancy between that statement and his own testimony that Neavitt had orally authorized him to write a check himself and sign Neavitt's name to it.

The evidence cannot be held insufficient to sustain the jury's verdict. By the use of the check Hanks got possession of the stallion. He kept the animal and insisted that Neavitt had had it hauled away, until the sheriff found it on the morning of July 30th. Certainly the jurors were not under the necessity of believing defendant's explanations, or his testimony concerning Neavitt, no trace of whom could otherwise be found. Certainly, also they were entitled to believe the testimony of Shumate, the sheriff, the handwriting expert, and the other witnesses for the state.

The other question raised by the appeal is the sufficiency of the information to charge a public offense. The information recites that the county attorney charges "that the said

R. F. Hanks * * * did * * * defraud R. A. Shumate of a buckskin stallion * * * by * * * falsely and feloniously representing'' to Shumate that he was acting as agent for Neavitt ''in the purchase of said horse * * * and that the check which was then and there delivered'' by Hanks to Shumate ''as payment for said horse'' was the check of Neavitt and had been received by Hanks ''to be delivered to'' Shumate ''as the purchase price of said horse.''

The information may not be a model of pleading in some respects; for instance, it does not directly allege that the defendant defrauded Shumate by means of the check. Section 11843, Revised Codes, provides that an information, must among other things, contain ''a statement of the facts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended.'' Section 11844 provides for the form of an information. Section 11845 provides that the information ''must be direct and certain'' with reference to the party and offense charged and to ''the particular circumstances of the offense charged, when they are necessary to constitute a complete offense.'' Section 11898 provides for a demurrer to the information on a number of grounds, among which is the ground ''that it does not substantially conform to the requirement of sections 11843, 11844 and 11845 of this code.''

Section 11906 provides: ''When the objections mentioned in section 11898 appear on the face of the indictment or information, they can only be taken by demurrer, except that the objection to the jurisdiction of the court over the subject of the indictment or information, or that the facts stated do not constitute a public offense, may be taken at the trial, under the plea of not guilty, or after the trial, in arrest of judgment.''

It is not necessary to determine whether the technical objections to the information, including the objection that some of the allegations are indirect rather than direct, would have been material if raised by demurrer; for no demurrer was filed. There can be no doubt that the allegations were not so defective

as not to acquaint defendant with the charge against him or to subject him to another possible prosecution for the same offense, or to prevent the information from stating a public offense.

But defendant specifically contends that it is necessary, in informations charging the crime of obtaining property by false pretenses, to allege specifically the ownership of the property obtained; that such an allegation goes not merely to the form but to the very substance of the information; and that since the ownership of the property was not alleged the information was insufficient to state a public offense.

We find that there are three different rules upon the point. The numerical weight of authority seems to be that expressed by the New Mexico court (in *State* v. *Faggard,* 25 N. M. 76, 177 Pac. 748) that the information is fatally defective unless the ownership of the property is directly and distinctly alleged. A second rule is that the charge is sufficient if the ownership is indicated by the allegations of the information even though not directly alleged. (*State* v. *Timmerman,* 88 Utah 481, 55 Pac. (2d) 1320, 56 Pac. (2d) 1354; *State* v. *Knowlton,* 11 Wash. 512, 39 Pac. 966; and *State* v. *Balliet,* 63 Kan. 707, 66 Pac. 1005.)

The third rule is that under statutes similar to ours the allegation of ownership is not necessary. A leading authority for that rule is *State* v. *Samaha,* 92 N. J. L. 125, 104 Atl. 305, 306, in which it was said, " 'Actual ownership' of the money or goods by the person upon whom the cheat is practiced is not essential. It is sufficient if he had lawful possession and dominion of the same." Other decisions to the same effect are *Ireton* v. *State,* 29 Okl. Cr. App. 266, 233 Pac. 771; *Arnett* v. *People,* 91 Colo. 56, 11 Pac. (2d) 806; and *Kelly* v. *State,* 59 Nev. 190, 89 Pac. (2d) 1.

Defendant contends that the California courts have adopted the second rule, and cites 12 Cal. Jur. 466 as follows: "The ownership of the property obtained should be alleged, although the absence of a direct allegation is not fatal where the facts show ownership as clearly as a direct allegation would."

The only citation given in support of that proposition is *People*

v. *Skidmore*, 123 Cal. 267, 55 Pac. 984, 985, which was decided in 1899, after our adoption and modification of the California statute. But the decision does not bear out the statement that the ownership should be alleged; the court's only statement upon the point is as follows: ''Conceding in many cases the materiality of an allegation to the effect that the property obtained by the fraud was the property of the party defrauded, yet the absence of such an allegation in a case like the present is not fatal to the pleading, for the facts here set out show the ownership of the note as fully as though there was a direct allegation in the pleading to that effect.'' Thus the court held, not that the allegation of ownership was necessary, but that *''conceding in many cases the materiality''* of such allegation, its absence was not fatal where the facts alleged show the ownership. The decision therefore did not adopt the second rule, but in effect said only that if a showing of ownership were necessary it had been complied with.

It might be possible to dispose of this case similarly, for the allegations of the information would seem to indicate that Shumate was the owner of the stallion. If not, he would not, without something further, have been entitled to sell the animal, so as to be led to part with it because of Hanks' false representations that he was acting as Neavitt's agent *''in the purchase* of said horse,''* and that the check which he delivered ''as *payment* for said horse'' was Neavitt's check and had been given Hanks for delivery to Shumate ''as the *purchase price* of said horse.''

Thus we might perhaps dispose of this appeal without definitely adopting either rule. But we prefer to adopt a definite rule, in the interest of certainty, and it seems to us that the third rule is the most reasonable,—namely, that neither an allegation of actual ownership, nor the allegation of facts showing such ownership, is essential.

In *Kelly* v. *State*, supra [59 Nev. 190, 89 Pac. (2d) 3], the Nevada Court said: ''As we understand the contention of appellant, a person could not be guilty of the crime of obtaining money under false pretense or false representation unless the

money received was owned by the person defrauded. Certainly such would be the result if the information must contain an allegation of ownership in the defrauded person. We cannot subscribe to any such restricted interpretation. Section 10391, N. C. L. 1929, which defines the crime, makes no such restriction; it is made a crime to obtain by false pretense or pretenses money from 'any other person.' The information should not be required to allege more elements in charging a crime than the statute defining the crime requires. Lawful possession is all that is necessary.''

Our statute, section 11410, applies to ''Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property.'' It does not require that the money or property necessarily belong to the person defrauded and we have no authority for writing that requirement into the statute.

We have examined the other contentions of appellant and find them without merit. There can be no doubt that the information sufficiently acquainted the defendant with the charge and that it amply protects him against another prosecution for the same offense.

The judgment is affirmed.

ASSOCIATE JUSTICES ERICKSON, ANDERSON, MORRIS and ADAIR concur.